ORAL ARGUMENT NOT YET SCHEDULED
No. 15-1035

IN THE
United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————

MAHER TERMINALS, LLC,
*Petitioner*,

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF AMERICA,
*Respondents,*

PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
*Intervenor.*
————————

ON PETITION FOR REVIEW OF FINAL MEMORANDUM OPINION AND
ORDER OF THE FEDERAL MARITIME COMMISSION

**BRIEF OF THE RESPONDENTS, FEDERAL MARITIME COMMISSION
AND UNITED STATES OF AMERICA**

WILLIAM J. BAER
*Assistant Attorney General*

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
*Attorneys*
DEPARTMENT OF JUSTICE
Antitrust Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone: (202) 514-2460

TYLER J. WOOD
*General Counsel*

JOEL F. GRAHAM
*Attorney-Advisor*
FEDERAL MARITIME COMMISSION
Office of General Counsel
800 N. Capitol Street, N.W.
Washington, D.C. 20573
Phone: (202) 523-5740

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.      <u>Parties and Amici</u>

All parties, intervenors, and amici appearing before the Federal Maritime Commission ("Commission") and in this court are listed in the Brief for Petitioner.

B.      <u>Rulings under Review</u>

References to the rulings at issue appear in the Brief for Petitioner.

C.      <u>Related Cases</u>

Petitioner's Brief lists four related cases, but omits one. As part of the proceedings before the Commission, the Port Authority of New York and New Jersey moved to enforce an Administrative Law Judge's subpoena in the United States District Court for the Western District of New York. On July 9, 2012, the district court granted the motion. *In re Subpoena of David G. Eidman*, Case No. 12-mc-6008-CJS (W.D.N.Y. July 9, 2012), ECF No. 17.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ............................................................................iv

GLOSSARY AND NOTE ON CITATIONS ............................................................x

INTRODUCTION ...........................................................................................1

STATEMENT OF ISSUES .................................................................................2

STATUTES AND REGULATIONS ......................................................................2

STATEMENT OF THE CASE.............................................................................3

      I.      Factual Background...................................................................3

            A.     The Port Authority Plans to Modernize Port Infrastructure and Renegotiate Terminal Leases ......................................................3

            B.     Ocean Carriers Maersk and Sea-Land Threaten to Leave the Port ...........................................................................................5

            C.     The Port Authority Enters Complex, Long-Term Leases with APM-Maersk and Maher ..........................................................8

            D.     After the Leases Are Executed, Maher is Generally Successful until the Global Recession Impacts the Port .............................11

      II.     Procedural History.................................................................14

SUMMARY OF ARGUMENT ...........................................................................17

ARGUMENT ...............................................................................................19

      I.      Standard of Review ...............................................................19

      II.     The Commission Properly Denied Maher's Unreasonable Preference Claim .................................................................20

            A.     The Evidence Showed that the Threat by Sea-Land and Maersk to Leave the Port was Credible and Presented Grave Risks.....21

            B.     The Commission Correctly Held that Maher Did Not Prove that the Difference in Base Rent was Unjustified in Light of the Evidence..............................................................................23

  C. The Commission's Findings Regarding the Port Guarantee and Terminal Characteristics Are Supported by Substantial Evidence ....................................................................................32

 III. The Commission Correctly Concluded that Maher Failed to Prove Its Unreasonable Practice Claim ............................................................37

  A. The Commission Applied the Appropriate Standard ..............38

  B. The Commission's Conclusion that Maher Had Not Established an Unreasonable Practice Claim Is Supported by Substantial Evidence ................................................................................40

CONCLUSION ......................................................................................43

CERTIFICATE OF COMPLIANCE....................................................45

CERTIFICATE OF SERVICE .............................................................46

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974)...30

*Casino Airlines, Inc. v. Nat'l Transp. Safety. Bd.*, 439 F.3d 715 (D.C. Cir. 2006)…. ...................................................................................................................36

*Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ................19, 24

*Chiquita Brands Int'l Inc. v. SEC*, Case No. 14-5030, 2015 U.S. App. LEXIS 12348 (D.C. Cir. July 17, 2015) ...............................................................30

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197 (1938) ................20

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966)....................................... 19-20

*Dresser Indus., Inc. v. Interstate Commerce Comm'n*, 714 F.2d 588 (5th Cir. 1983) ............................................................................................... 25-26, 31

*Fed. Mar. Comm'n v. S. Car. State Ports Auth.*, 535 U.S. 743 (2002) ..................29

*Harborlite Corp. v. Interstate Commerce Comm'n*, 613 F.2d 1088 (D.C. Cir. 1979) ...........................................................................................................25, 30

*In re Subpoena of David G. Eidman*, Case No. 12-mc-6008-CJS (W.D.N.Y. July 9, 2012), ECF No. 17. ...........................................................................................i

*Interstate Commerce Comm'n v. Del., Lackawanna & W. R.R. Co.*, 220 U.S. 235 (1911) ................................................................................................... 26

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007)................19

*L.T. Barringer & Co. v. United States*, 319 U.S. 1 (1943) ...............................25, 26

*Maher Terminals, LLC v. Fed. Mar. Comm'n*, Case No. 14-1051, 2014 U.S. App. LEXIS 13379 (D.C. Cir. July 14, 2014) ................................................................16

*Maher Terminals, LLC v. Fed. Mar. Comm'n*, Case No. 13-1028, 2013 U.S. App. LEXIS 12462 (D.C. Cir. June 18, 2013) .............................................................16

*Malladi Drugs & Pharms., Ltd. v. Tandy*, 552 F.3d 885 (D.C. Cir. 2009) ....... 30-31

*Md. Port Admin. v. Fed. Mar. Comm'n*, Case No. 97-2418, 1998 U.S. App. LEXIS 25733 (4th Cir. Oct. 13, 1998)................................................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)… .......................................................................................................19

*New York v. United States*, 331 U.S. 284 (1947)....................................................24

*N.Y. Shipping Ass'n v. Fed. Mar. Comm'n*, 854 F.2d 1338 (D.C. Cir. 1988)...23, 24

*Petchem, Inc. v. Fed. Mar. Comm'n*, 853 F.2d 958 (D.C. Cir. 1988) .........19, 23, 30

*Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536 (D.C. Cir. 1988) ...............................................................................38

*R.I. Consumers' Council v. Fed. Power Comm'n*, 504 F.2d 203 (D.C. Cir. 1974)…. .......................................................................................................30

*Syracuse Peace Council v. Fed. Commc'ns Comm'n*, 867 F.2d 654 (D.C. Cir. 1988) ................................................................................................36

*Texas & Pac. Ry. Co. v. Interstate Commerce Comm'n*, 162 U.S. 197 (1896)……... ................................................................................................25, 26

*United Steel Workers v. Pension Benefit Guar. Corp.,* 707 F.3d 319 (D.C. Cir. 2013) ................................................................................................40

*Vernal Enters. v. Fed. Commc'ns Comm'n*, 355 F.3d 650 (D.C. Cir. 2004) ..........28

*\*Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261 (1968)…...................................................................................37, 38, 39

*Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355 (5th Cir. 2009)...........................26

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A)................................................................................19

46 U.S.C. § 40101(1) ..............................................................................32

46 U.S.C. § 41102(c) ...............................................................15, 17, 37, 38

46 U.S.C. § 41106(2) ...............................................1, 14, 16, 20, 23, 25

46 U.S.C. § 41106(3) ...............................................................................15

46 U.S.C. § 41301(a) ...............................................................................15

vi

Interstate Commerce Act of 1887, ch. 104, § 2, 24 Stat. 379 .................................. 26

Interstate Commerce Act of 1887, ch. 104, § 3, 24 Stat. 379 .......................... 25, 26

Shipping Act of 1984, Pub. L. No. 98-237, § 10(b)(10), 98 Stat. 67 ..................... 26

Shipping Act of 1984, Pub. L. No. 98-237, § 10(b)(11), 98 Stat. 67 ..................... 20

Shipping Act of 1984, Pub. L. No. 98-237, § 10(b)(12), 98 Stat. 67 ..................... 20

Shipping Act of 1984, Pub. L. No. 98-237, § 10(d)(1), 98 Stat. 67 ....................... 38

Shipping Act of 1916, Pub. L. No. 64-259, ch. 451, § 16, 39 Stat. 728 ............ 20, 25

Shipping Act of 1916, Pub. L. No. 64-259, ch. 451, § 17, 39 Stat. 728 ............ 26, 38

## FEDERAL MARITIME COMMISSION CASES

*"50 Mile Container Rules" Implementation by Ocean Common Carriers Serving U.S. Atl. & Gulf Coast Ports*, 24 S.R.R. 411 (FMC 1987) ...................................... 24

*APM Terminals N. Am., Inc. v. Port Auth. of N.Y. & N.J.*, 31 S.R.R. 623 (FMC 2009) ................................................................................................... 15

*APM Terminals N. Am., Inc. v. Port Auth. of N.Y. & N.J.*, 31 S.R.R. 455 (ALJ 2008) ................................................................................................... 14

*Ballmill Lumber & Sales Corp. v. Port of New York Auth.*, 10 S.R.R. 131 (FMC 1968) ................................................................................................. 27, 28

*Ceres Marine Terminals, Inc. v. Md. Port Admin.*, 30 S.R.R. 358 (FMC 2004) ....29

*Ceres Marine Terminals, Inc. v. Md. Port Admin.*, 29 S.R.R. 356 (FMC 2001)…
...............................................................................................................25, 29, 32

*\*Ceres Marine Terminal, Inc. v. Md. Port Admin.*, 27 S.R.R. 1251 (FMC 1997)…… ................................................................. 20, 23, 25, 27, 28, 29, 34, 38

*Credit Practices of Sea-Land Serv. Inc.*, 25 S.R.R. 1308 (FMC 1990)...................24

*\*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 821 (FMC 2014)….. ….. ..ix, 3, 4, 5, 6, 9, 10, 11, 12, 13, 16, 17, 21, 22, 23, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38-39, 40, 42

*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 349 (ALJ 2014)…...
................................................................................ ix, 3, 4, 5, 10, 11, 16

*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 303 (FMC 2014)…..
................................................................................................................16

*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 32 S.R.R. 1185 (FMC 2013)…
.............................................................................................................15, 16

*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 32 S.R.R. 1 (ALJ 2011) .......15

*\*N. Atl. Mediterranean Freight Conference – Rates of Household Goods*, 9 S.R.R. 775 (FMC 1967).......................................................................24, 25, 26

*NPR, Inc. v. Bd. of Comm'rs of the Port of New Orleans*, 28 S.R.R. 1512 (ALJ 2000) ....................................................................................................38

## FEDERAL RULES

Fed. R. App. P. 28(f) ........................................................................................2

Fed. R. App. P. 32 ..........................................................................................45

Fed. R. App. P. 32.1 ........................................................................................2

D.C. Circuit Rule 28(a)(5) ...............................................................................2

D.C. Circuit Rule 32(e) ..................................................................................45

D.C. Circuit Rule 32.1(b)(3) .......................................................................2, 45

<u>*        Authorities on which we chiefly rely.</u>

## **GLOSSARY AND NOTE ON CITATIONS**

For consistency, Respondents adopted Petitioner's abbreviations and acronyms, which are not necessarily the same as those in the Commission's decisions. The Commission's official opinions and orders are published in the Pike & Fischer Shipping Regulation Report (Bloomberg BNA), which the Commission abbreviates as "S.R.R." Following this convention, Respondents cite the Administrative Law Judge's ("ALJ") Initial Decision dated April 25, 2014, as *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 349 (ALJ 2014), and the Commission's Memorandum Opinion and Order dated December 17, 2014, as *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 821 (FMC 2014).

| | |
|---|---|
| Exc. | Exceptions |
| ICA | Interstate Commerce Act |
| ICC | Interstate Commerce Commission |
| M. App. | Maher Appendix (before Commission) |
| M. Supp. App. | Maher Supplemental Appendix (before Commission) |
| P. App. | Port Authority Appendix (before Commission) |
| P. Supp. App. | Port Authority Supplemental Appendix (before Commission) |
| R. Add. | Respondents' Addendum |
| S.R.R. | Pike & Fischer Shipping Regulation Report |

## **INTRODUCTION**

In 2008, Petitioner Maher Terminals, LLC ("Maher") filed a complaint with the Federal Maritime Commission ("Commission") alleging numerous violations of the Shipping Act of 1984, 46 U.S.C. § 40101 et seq. ("Shipping Act), related to its marine terminal lease. Among other things, Maher argued that the Port Authority of New York and New Jersey ("Port Authority)" violated the prohibition against unreasonable prejudice or preference by charging Maher higher base (per acre) rent than it charged APM Terminals North America, Inc. ("APM-Maersk"), a terminal operator affiliated with ocean carrier Maersk Lines ("Maersk").

After years of litigation, the Commission denied Maher's Shipping Act claims. The Commission found that the Port Authority charged APM-Maersk lower base rent than it charged Maher, but it held that Maher failed to establish that the difference in base rent (or other differences between the leases) amounted to an unreasonable preference or prejudice in violation of 46 U.S.C. § 41106(2). The Commission determined that the base rent difference was justified in this case because the Port Authority provided rent concessions to APM-Maersk to prevent ocean carriers Maersk and Sea-Land Service Inc. ("Sea-Land") from carrying out their credible threat to leave the Port of New York and New Jersey for another port.

The Commission's decision is sound, its findings are supported by substantial evidence, and its rulings are consistent with both the Shipping Act and the transportation business. Accordingly, Maher's petition, which would blind the Commission to transportation realities, should be denied.

## STATEMENT OF ISSUES

I.      Whether the Commission's conclusion that Maher failed to prove an unreasonable preference claim was contrary to law, unsupported by substantial evidence, or arbitrary and capricious.

II.      Whether the Commission's conclusion that Maher failed to prove an unreasonable practice claim was contrary to law, unsupported by substantial evidence, or arbitrary and capricious.

## STATUTES AND REGULATIONS

Pertinent statutes and rules are contained in the Addendum. Fed. R. App. P. 28(f); D.C. Circuit Rule 28(a)(5). Additionally, because Commission opinions and orders as published in the S.R.R. are not available in a publicly accessible electronic database, the Addendum contains copies of cited Commission materials. Fed. R. App. P. 32.1; D.C. Circuit Rule 32.1(b)(3).

## STATEMENT OF THE CASE

### I.     Factual Background

The Port Authority, like most ports in the United States, does not itself coordinate the loading and unloading of vessels but instead relies on tenant companies to provide marine terminal services to vessels that call at the port. Maher and APM-Maersk are two such companies. In the late 1990s they began negotiating new terminal leases with the Port Authority, and in late 1999 and 2000, APM-Maersk and Maher entered long-term, complex marine terminal leases. The case before the Commission involved multiple provisions of these leases and the Port Authority's conduct in negotiating and attempting to enforce them. This appeal involves only Maher's and APM-Maersk's base rent.

### A.     The Port Authority Plans to Modernize Port Infrastructure and Renegotiate Terminal Leases

The Port Authority owns, and is the landlord for, the Port of New York and New Jersey -- the third largest seaport in North America and the largest maritime cargo center on the East Coast. *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 349, 358 (ALJ 2014) [R. Add.-236]. Prior to executing the leases at issue, the Port Authority leased two terminals to Maher -- the Tripoli Street Terminal and the Fleet Street Terminal – and several terminals to APM-Maersk's predecessors, affiliates, and related companies, including the Sea-Land Terminal. *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 821, 831 (FMC

3

2014) [R. Add.-196]; M. App. 1D-1913 (JA-__); M. App. 2A-215 (JA-__). Unlike

Maher, APM-Maersk was, and is, affiliated with ocean carrier Maersk Line, the

largest ocean carrier in the world. *Maher Terminals*, 33 S.R.R. at 831 [R. Add.-

196]; *Maher Terminals*, 33 S.R.R. at 359 [R. Add.-237].

In the 1990s, the Port Authority began a multi-faceted and extensive

modernization of the port. *Maher Terminals*, 33 S.R.R. at 831 [R. Add.-196].

Among its goals were to address insufficient terminal infrastructure and

configurations and to decrease the extent to which it had to subsidize the port from

other sources of revenue such as the airports. *Id.*; P. App. I-200 (JA-__). Because

most of the terminal leases were set to expire in 1999 or 2000, the Port Authority

planned to restructure the terminal leases to encourage efficient land use by the

terminal operators. *Maher Terminals*, 33 S.R.R. at 831 [R. Add.-196]; *Maher

Terminals*, 33 S.R.R. at 361 [R. Add.-239]. The Port Authority intended that new

leases would be throughput-based, that is, the rent would be based on the number

of containers handled by a terminal. *Maher Terminals*, 33 S.R.R. at 831 [R. Add.-

196].

In 1997, the Port Authority reached a tentative agreement with Maher for a

throughput-based lease. *Maher Terminals*, 33 S.R.R. at 361 [R. Add.-239]; P. App.

I-201-04 (JA-__-__). Maher's annual throughput rent under this proposal would

have been equivalent to approximately $68,750 in per acre rent. P. App. II-157

4

(JA-__). Although the Port Authority "intended to charge the same lease rates to all terminal operators at the New Jersey Marine Terminals complex," it informed Maher that it could not represent that this approach would ultimately be followed and that it would not include language to that effect in a lease. P. App. 1-201 (JA-__).

     B.    <u>Ocean Carriers Maersk and Sea-Land Threaten to Leave the Port</u>

The negotiations were placed temporarily on hold, however, when the Port Authority began negotiating with Sea-Land and Maersk, two of the largest carriers at the port. *Maher Terminals*, 33 S.R.R. at 832 [R. Add.-197]; *Maher Terminals*, 33 S.R.R. at 361-62 [R. Add.-239-40].[1] Sea-Land rejected the Port Authority's proposal of a throughput-based terminal lease as too expensive and threatened to leave the port if it did not receive a better offer. *Maher Terminals*, 33 S.R.R. at 832 [R. Add.-197]; P. App. I-273 (JA-__). After Sea-Land rejected another Port Authority offer, P. App. I-292-97 (JA-__-__), it and Maersk jointly issued a request for proposal to several East Coast ports for an "East Coast Hub Terminal." *Maher Terminals*, 33 S.R.R. at 832 [R. Add.-197]; M. App. 1A-307-371 (JA-__).

---

[1] In 1997, Sea-Land and Maersk entered into a joint operating arrangement and discussed consolidating their terminal operations. *Maher Terminals*, 33 S.R.R. at 832 [R. Add.-197]. In 1999, Maersk and Sea-Land consolidated their terminal operations, and, later, Maersk acquired Sea-Land's international container shipping business and related terminals. *Id.* at 834 [R. Add.-199].

The threat to leave the port was not only credible, it was also serious given these carriers' importance to transportation at the port and the region's economy. *Maher Terminals*, 33 S.R.R. at 832-33 [R. Add.-197-98]. As Port Authority Commissioner Philibosian put it, "the name of the organization was The Port Authority of New York and New Jersey. If Sea-Land/Maersk left, you might as well change the name to the Authority of New York and New Jersey." M. App. 2B-442 (JA-__). Similarly, the Port Authority's deputy executive director testified that the fallout from the carriers leaving the port would have been "disastrous" and no one with an interest in the port generally "doubted for one minute that retaining Maersk in the port was critical to the future of the port and the economy of the region." P. App. II-244 (JA-__).

The Port Authority's concerns were confirmed by a report it commissioned from Paul F. Richardson Associates, Inc. *Maher Terminals*, 33 S.R.R. at 832 [R. Add.-197]. According to the Richardson report, there was: (1) "an extremely high risk of losing all of the Sea-Land/Maersk cargo and up to 55% of the [the port's] entire containerized cargo base;" (2) "[t]he consequences of such a loss to the competitiveness of the Port and associated regional economic activity would be severe and irrevocable;" and (3) "[c]onversely, the potential benefits to be derived from the retention of this business are considerable and would constitute the cornerstone of the Port's Hub Port potential." P. App. 1-374, 393 (JA-__, __). The

report found that if Sea-Land/Maersk left, other carriers would likely divert their cargo due to an increased cost spiral. *Id.* at 375 (JA-\_\_). An increase in costs could also cause terminal operators to "dis-invest in operating equipment and facilities over the longer term." *Id.* at 388 (JA-\_\_). The report further estimated that tens of thousands of jobs and billions of dollars in economic activity would be lost. *Id.* at 376 (JA-\_\_). By contrast, if the Port Authority were to retain Sea-Land/Maersk in the form of a hub port as envisaged by the request for proposal, port volume was projected to increase substantially and thousands of new jobs would be created. *Id.*

Maher, too, was concerned about the consequences of Sea-Land and Maersk leaving the port. According to Maher's vice president of finance, Maher was better off with Maersk in the port, and it tried to convince the Port Authority to retain the carrier. P. App. II-91 (JA-\_\_); *see also* P. App. II-357 (JA-\_\_). Brian Maher, Maher's then-CEO, was quoted in a news article as stating that Maher's "plans of investing between $75 million and $100 million in the next five years would have been stalled if the two companies had decided to leave." P. App. I-1157 (JA-\_\_). Maher was also concerned that if Maersk left the port, the empty terminal would be occupied by a tenant that presented a greater competitive threat to Maher. P. App. VII-328-29 (JA-\_\_); P. App. VII-332 (JA-\_\_).

In order to assist the Port Authority to retain Sea-Land/Maersk, Maher's CEO wrote to the governor of New Jersey to explain the "dangerous" status of the

7

lease negotiations and the "grave" risk to the port. P. App. I-1043-46 (JA-__-__). If Sea-Land and Maersk were to leave the port, he wrote: (1) employment payrolls in the area would decline by close to $100 million annually; (2) the port would lose 25-30% of its current volume, resulting in higher costs to the remaining business and motivating other major carriers to look for alternatives; (3) the private sector would be unlikely to invest in port infrastructure and generate the revenue necessary to repay the Port Authorities infrastructure investments; and (4) plans to expand or develop other terminals would be significantly delayed or abandoned. *Id.* at 1044-45 (JA-__-__). Mr. Maher asserted that the successful conclusion of lease negotiations, however, would stabilize port facilities and maximize the "significant economic benefits derived from the investments the state and the federal government are already making in the channels and the transportation infrastructure." P. App. I-1045-46 (JA-__-__). He concluded that "to permit two major employers to leave the state is unthinkable." P. App. I-1046 (JA-__).

C.    The Port Authority Enters Complex, Long-Term Leases with APM-Maersk and Maher

Sea-Land and Maersk eventually informed the Port Authority that because it would cost approximately $115 to $120 million more to create a major port facility in New Jersey than it would in Baltimore, they would leave the port unless the Port Authority provided them a cost reduction package of $120 million. P. App. I-2679 (JA-__); P. App. I-1064 (JA-__); P. App. I-107-71 (JA-__-__). The Port Authority

8

offered to meet the $120 million figure via $30 million in free capital, "which was comparable to what is already in the model for Maher," and $90 million in rent concessions, which equated to base rent of $19,000 per acre for the term of the lease. P. App. I-1081 (JA-__).[2]

Although Sea-Land and Maersk initially "were not prepared . . . to guarantee any level of cargo in exchange for the $120 million," P. App. I-1064 (JA-__), the Port Authority sought several guarantees "to justify concessions of this magnitude." M. App. 1B-731. These included a throughput guarantee, a terminal investment requirement, and a port guarantee wherein Sea-Land/Maersk would guarantee that a certain number of their own containers move through the port annually on their ships. M. App. 1B-731 (JA-__). The purpose of the latter was to "assure that the carriers do not preclude competition by tying up this terminal for third party business and divert their own business to Baltimore where they may have cheaper labor rates available" and to assure that the Port Authority obtained "cargo they presently ship through other ports on the East Coast in addition to the

---

[2] Some of the Port Authority's members were concerned about the cost of meeting Sea-Land/Maersk's demands, and mentioned recouping any subsidy from other port tenants. M. App. 1A-442-45 (JA-__). Although Maher raised an "unlawful subsidy" argument in its exceptions to the Initial Decision, the Commission found that Maher had not established that the Port Authority actually charged Maher higher rent in order to subsidize APM-Maersk's lease. *Maher Terminals*, 33 S.R.R. at 846-47 [R. Add.-211-12]. Maher does not raise the unlawful subsidy argument on appeal, although it does insist that the Port Authority increased its rent to make up for APM-Maersk's subsidies. Pet. Br. at 14-15, 47.

port's growth cargo." M. App. 1B-585 (JA-___); M. App. 1B-731 (JA-___); P. App. I-1083 (JA-___); *Maher Terminals*, 33 S.R.R. at 365-68 [R. Add.-243-46].

In late 1999, APM-Maersk agreed to a lease for a 350-acre marine terminal. *Maher Terminals*, 33 S.R.R. at 834 [R. Add.-199]; *Maher Terminals*, 33 S.R.R. at 359 [R. Add.-237].[3] The lease provided for an annual base rent of $19,000 per acre, throughput rent, a terminal guarantee, and infrastructure investment requirements. The base rent was also subject to a port guarantee whereby APM-Maersk agreed that each year certain volumes of loaded, Maersk-affiliated containers would go through the port, at any terminal. *Maher Terminals*, 33 S.R.R. at 834 [R. Add.-199].[4] If APM-Maersk failed to meet the port guarantee for two consecutive years, its base rent would increase. *Id.*

Maher was aware of the status of the Maersk negotiations, and the Port Authority-Maher negotiations restarted in 1999. *Id.* at 834 [R. Add.-199]; P. App. II-92 (JA-___); P. App. II-258-59 (JA-___-___); P. App. II-113. Although the Port Authority declined to offer Maher the APM-Maersk base rent, it negotiated with Maher about non-rent considerations that were important to Maher. *Maher Terminals*, 33 S.R.R. 834-35 [R. Add.-199-200]; M. App. 2B-349-50 (JA-___-___);

---

[3] In 1999, Maersk retreated from the "hub port" concept and decided that it would continue to spread its cargo over several ports. P. App. I-2696-97 (JA-___-___).

[4] The volumes were 365,000 during the first guarantee period, 440,000 during the second guarantee period, and 515,000 during the third guarantee period. *Id.* at 834 n.4 [R. Add.-199]; M. App. 5A-347 (JA-___).

P. App. II-134-36 (JA-__-__). In October 2000, Maher and the Port Authority

executed a lease for a consolidated 445-acre marine terminal. *Maher Terminals*, 33

S.R.R. at 835 [R. Add.-200]; P. App. I-1586 (JA-__). The lease provided for an

annual base rent of $39,750 per acre with a two percent escalator, throughput rent,

a terminal guarantee, infrastructure investment requirements, a security deposit,

and a first point of rest for automobiles. *Maher Terminals*, 33 S.R.R. at 835 [R.

Add.-200]. Maher's base rent averages $53,753 over the life of the lease. M. App.

4-14 (JA-__). The lease provided Maher with the largest terminal in the port after

consolidation of its prior terminals, P. App. IV-328 (JA-__), and the single

continuous terminal resulted in "significant increases in container handling

capacity as well as the ability to reduce overall operating costs by eliminating

duplicative operating systems," P. App. I-1608 (JA-__).

## D.     After the Leases Are Executed, Maher Is Generally Successful until the Global Recession Impacts the Port

After signing the lease, Maher was profitable through at least 2007, and

entered into new contracts with several carriers. *Maher Terminals*, 33 S.R.R. at

373 [R. Add.-251]; P. App. II-271-73 (JA-__-__). In 2005, Maher's owners began

to explore selling the closely held, family owned company. *Maher Terminals*, 33

S.R.R. at 835-36 [R. Add.-200-01]. In connection with a potential sale, Maher's

owners engaged an investment house to advise them and to prepare an offering

11

memorandum to assist potential purchasers. P. App. I-1574 (JA-__); P. App. II-272 (JA-__). The resulting "Greenhill Memorandum" emphasized that Maher was "the single largest terminal operator, accounting for almost half all volume" and that its "facilities are approximately 50% larger than those of its closest direct competitor." P. App. I-1577 (JA-__); *see also id.* at 1582 (JA-__) ("The NYNJ Port Authority recognized Maher's contributions by entering into a new lease with the Company for premier terminal space in Port Elizabeth."). The memorandum downplayed APM-Maersk's status as potential competitor, noting that it is "not a true independent multi-user terminal" and characterizing Maher's lack of carrier affiliation as a competitive advantage over APM-Maersk. P. App. I-1584, 1614 (JA-__, __).

In 2007, Deutsche Bank, through subsidiary RREEF Alternative Investments ("RREEF"), purchased Maher for approximately $1.8 billion. *Maher Terminals*, 33 S.R.R. at 835-36 [R. Add.-200-01]. After the sale, Empire Valuation Consultants prepared a report to assist Maher and its new owners. *Maher Terminals*, 33 S.R.R. at 836 [R. Add.-201]. This Empire report stated that Maher management and RREEF believed that Maher's lease terms were neither materially above nor below market as of July 2007, and it stated that comparable information supported that conclusion. P. App. I-2136, 2148 (JA-__, __). It also stated that the notable difference between Maher's lease and "the publicly available agreements relate to

12

the basic annual rent amount." P. App. I-2149 (JA-__). According to the report,

"[m]anagement and RREEF attributed the differences in basic rental amount (and

per acre rental amount)" to Maher's "favorable infrastructure attributes, including:

(1) depth of channel, (3) [sic] length of berth; (3) size of yard; and (4) intermodal

access." P. App. I-2149-50 (JA-__-__). It also stated that management and RREEF

believed that higher basic rent reflects "the superior nature of the Maher property,

the additional flexibility in yard usage, and its infrastructure." *Id.* at 2150 (JA-__).

In 2008, the port's container traffic decreased from the previous year for the

first time since 1993, P. App. 1D-1795 (JA-__), and Maher and APM-Maersk

began to experience difficulties in part due to the global recession, *Maher

Terminals*, 33 S.R.R. at 836 [R. Add.-201]. APM-Maersk failed to meet the port

guarantee in 2008, 2009, and 2010, causing its rent to increase to $34,200 per acre

in 2010 and $32,300 per acre in 2011. *Maher Terminals*, 33 S.R.R. at 836 [R.

Add.-201]. Maher lost fifteen percent of its business in 2008, P. App. 1D-1796

(JA-__), and at some point lost Mediterranean Shipping Company, a large

customer, to Port Newark Container Terminal, a port tenant whose base rent was

*higher* than Maher's. P. App. VII-348-49 (JA-__-__); P. App. I-3507 (JA-__); P.

App. I-2247-48 (JA-__-__). The Port Authority recognized that the "optimistic

projections" used "to justify purchasing the terminals will be harder to achieve for

13

all terminals in 2009." P. App. 1D-1795 (JA-__). As of 2012, the estimated value

of Maher had declined to $400-500 million. M. Supp. App. 2A-98-99 (JA-__-__).

## II.    Procedural History

On June 3, 2008, approximately seven-and-a-half years after entering its

lease, Maher filed a complaint against the Port Authority challenging numerous

provisions of the lease as unlawful under the Shipping Act and seeking hundreds of

millions in damages. Compl. (JA-__-__); Maher Initial Br. at 12-13 (JA-__-__). At

that time, the parties were embroiled in a separate dispute that began in 2006 when

APM-Maersk filed a Shipping Act complaint alleging that the Port failed timely to

convey certain property to it. *See APM Terminals N. Am., Inc. v. Port Auth. of N.Y.

& N.J.*, 31 S.R.R. 455, 455 (ALJ 2008) (FMC Docket No. 07-01) [R. Add.-71]. In

that proceeding, the Port Authority filed a third-party complaint for

indemnification against Maher, who responded with several counterclaims against

the Port Authority. *Id.* at 455, 458 [R. Add.-71, 74]; Maher Initial Br. at 6-7, 80-99

(Oct. 7, 2011) (JA-__-__, __-__).[5]

In the present case, Maher asserted that the Port Authority violated 46

U.S.C. § 41106(2) by granting APM-Maersk several unreasonably preferential

lease terms, including base rent. Compl. ¶¶ IV.A-M (June 3, 2008) (JA-__-__);

---

[5] Maher filed suit against the Port Authority in 2012 in federal district court
challenging the base rent and throughput rent as unconstitutional. *Maher
Terminals, LLC v. Port Auth. of N.Y. & N.J.*, Case No. 12-6090, 2014 U.S. Dist.
LEXIS 98532, at *15-*16 (D.N.J. July 21, 2014).

Maher Initial Br. at 28-39 (JA-__-__). Maher further asserted that the Port

Authority violated 46 U.S.C. § 41102(c)'s prohibition against unreasonable

practices by overcharging Maher as compared to APM-Maersk, and violated 46

U.S.C. § 41106(3) by unreasonably refusing to deal or negotiate with respect to

Maher's requests for parity with APM-Maersk. Compl. ¶¶ IV.A, J-K (JA-__, __-

__); Maher Initial Br. at 57-66, 71-79 (JA-__-__, __-__). In 2009, the Commission

consolidated these claims with Maher's counterclaims from FMC Docket No. 07-

01. *APM Terminals N. Am., Inc. v. Port Auth. of N.Y. & N.J.*, 31 S.R.R. 623, 626

n.2 (FMC 2009) [R. Add.-69].

     The Port Authority subsequently moved for summary judgment on Maher's

unreasonable preference claims on the ground that they were barred by the

Shipping Act's three-year statute of limitations, 46 U.S.C. § 41301(a). The ALJ

granted-in-part and denied-in-part the motion. *Maher Terminals, LLC v. Port Auth.*

*of N.Y. & N.J.*, 32 S.R.R. 1, 33 (ALJ 2011) [R. Add.-318]. On administrative

appeal, the Commission denied the Port Authority's motion for summary judgment

with respect to cease-and-desist relief but granted it with respect to "Maher's claim

for reparations based on unreasonable discrimination in lease terms." *Maher*

15

*Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 32 S.R.R. 1185, 1190, 1195 (FMC 2013) [R. Add.-279, 284].[6]

As to the merits, after extensive discovery and multiple rounds of briefing, the ALJ issued an Initial Decision on April 25, 2014, denying Maher's claims and FMC Docket No. 07-01 counterclaims and dismissing the case with prejudice. *Maher Termin*als, 33 S.R.R. at 353-90 [R. Add.-231-68]. Maher filed exceptions to the Initial Decision, and, on December 17, 2014, the FMC affirmed it. *Maher Terminals*, 33 S.R.R. at 830-61 [R. Add.-195-226].

The Commission found that Maher failed to meet its burden on its § 41106(2) unreasonable preference claim because although some of APM-Maersk's lease terms were more favorable than corresponding Maher lease terms, including the base rent, Maher failed to show that the Port Authority's reasons for treating the two terminal operators differently were not legitimate under the Shipping Act. *Maher Terminals*, 33 S.R.R. at 841-52 [R. Add.-206-17]. The Commission further

---

[6]      Maher petitioned for reconsideration of the Commission's statute of limitations order and filed a petition for review of it with this Court. The Commission denied the petition for reconsideration, *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 33 S.R.R. 303, 307 (FMC 2014) [R. Add.-273], and this Court dismissed the petition because it sought review of a non-final order, *Maher Terminals, LLC v. Fed. Mar. Comm'n*, Case No. 13-1028, 2013 U.S. App. LEXIS 12462, at *1-*2 (D.C. Cir. June 18, 2013). After the Commission denied the petition for reconsideration, Maher filed another petition for review, which the Court again dismissed as premature. *Maher Terminals, LLC v. Fed. Mar. Comm'n*, Case No. 14-1051, 2014 U.S. App. LEXIS 13379, at *1-*2 (D.C. Cir. July 14, 2014). Maher does not seek review of the Commission's reconsideration order.

found that "Maher has not met its burden of establishing a § 41102(c) [unreasonable practice] violation because it has not shown that its rent is not commensurate with the benefits it received from its lease." *Id.* at 852-53 [R. Add.-217-18]. The Commission also denied Maher's unreasonable refusal to deal claims and FMC Docket No. 07-01 counterclaims. *Id.* at 853-61 [R. Add.-218-26].

## <u>SUMMARY OF ARGUMENT</u>

The Commission's conclusion that Maher failed to prove that the Port Authority violated the Shipping Act is supported by substantial evidence and is neither arbitrary and capricious nor contrary to law. The Commission found that although the Port Authority charged APM-Maersk lower base rent than it charged Maher, this was justified because APM-Maersk was affiliated with ocean carriers who made a serious threat to leave the port if their demands were not met. Maher did not meaningfully challenge the credibility of this threat or its severity. Nor could it have done so, as the evidence showed that losing the carriers would have inflicted significant damage on transportation at the port but that retaining them was expected to provide benefits portwide. Rather than challenging the evidence, Maher argues that, as a matter of law, the Commission cannot consider these factors. But the Shipping Act does not require the Commission to ignore transportation and business realities. To the contrary, the Commission is required

17

to consider all the circumstances surrounding the situation, and it reasonably did so in this case.

The Commission further found that the evidence showed that the port guarantee in APM-Maersk's lease and the differences between the two terminals were factors that affected the difference in base rent. These narrow findings are supported by substantial evidence. The Commission did not find that these factors were alone sufficient to explain the base rent difference, as retaining Sea-Land and Maersk and their volume was, in this case, a legitimate and complete justification for the difference in base rent. Consequently, should the Court find fault with the Commission's analysis of the port guarantee and terminal characteristics, the Commission's decision should be sustained nonetheless.

The Commission also applied the proper standard in analyzing Maher's "unreasonable practices" claim and correctly concluded that in light of all of the relevant evidence, Maher had not shown that its rent was disproportionate to the benefits it received under its lease. Finally, the Commission agrees with Maher that the Commission should be afforded the opportunity, if necessary, to interpret its summary judgment order in the first instance.

18

# ARGUMENT

## I. STANDARD OF REVIEW

The court reviews Commission decisions under the "highly deferential"

standard of the Administrative Procedure Act, under which the Court will set aside

agency action "only if it is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law." *Islamic Am. Relief Agency v. Gonzales*,

477 F.3d 728, 732 (D.C. Cir. 2007) (quoting 5 U.S.C. § 706(2)(A))*; Petchem, Inc.*

*v. Fed. Mar. Comm'n*, 853 F.2d 958, 962 (D.C. Cir. 1988). The scope of review

under the arbitrary and capricious standard is narrow, and a reviewing court will

determine only whether the agency "examine[d] the relevant data and articulat[ed]

a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The court reviews the Commission's interpretation of the Shipping Act

pursuant to *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984),

under which the court will defer to the Commission's reasonable interpretation of

an ambiguous statutory provision. The Commission's findings of fact are sufficient

if supported by substantial evidence, that is, "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## II.    THE COMMISSION PROPERLY DENIED MAHER'S UNREASONABLE PREFERENCE CLAIM

The Commission did not err in concluding that Maher failed to prove a violation of 46 U.S.C. § 41106(2), which prohibits a marine terminal operator such as the Port Authority from "giv[ing] any undue or unreasonable preference or advantage or impos[ing] any undue or unreasonable prejudice or disadvantage with respect to any person."[7] Maher alleged, among other things, that the difference between its base rent and APM-Maersk's base rent constituted an unreasonable preference or unreasonable prejudice. To prove its claim, Maher had to establish that: "(1) two parties are similarly situated or in a competitive relationship, (2) the parties were accorded different treatment, (3) the unequal treatment is not justified by differences in transportation factors, and (4) the resulting prejudice or disadvantage is the proximate cause of injury." *Ceres Marine Terminal, Inc. v. Md. Port Admin.* ("*Ceres I*"), 27 S.R.R. 1251, 1270 (FMC 1997) [R. Add.-167].

---

[7] Section 41106(2) is a codification of sections 10(b)(11) and 10(b)(12) of the Shipping Act of 1984, Pub. L. No. 98-237, § 10, 98 Stat. 67, 78. Sections 10(b)(11) and 10(b)(12) themselves "essentially recodify the standards of" section 16 First of the Shipping Act of 1916, Pub. L. No. 64-259, ch. 451, §16, 39 Stat. 728, 734. *Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 547 (D.C. Cir. 1988).

Although the Commission determined that Maher met its burden on the first two elements, it also held that Maher had not shown that the Port Authority's treatment of Maher and APM-Maersk with respect to base rent was unjustified. The Commission's conclusion is supported by substantial evidence and is neither arbitrary and capricious, nor contrary to law. In contrast, Maher invites the Court to reweigh the evidence and limit the discretion of the Commission, the agency with expertise in the operation of marine terminals, to determine what is unreasonable under the Shipping Act.

A.    The Evidence Showed that the Threat by Sea-Land and Maersk to Leave the Port was Credible and Presented Grave Risks

The Port Authority asserted that the difference between Maher's base rent and APM-Maersk's base rent was justified by the Port Authority's need to prevent Sea-Land and Maersk from leaving the port. *Maher Terminals*, 33 S.R.R. at 842 [R. Add.-207]. In support, the Port Authority presented unchallenged evidence that Sea-Land and Maersk's threat to leave the port was more than a negotiating ploy or an after-the-fact litigation argument. The evidence showed that Sea-Land and Maersk rejected numerous Port Authority offers and solicited bids from several ports via a formal request for proposal, and Port Authority officials as well as Maher executives took this threat seriously. *See* Statement of the Case Part I.B, *supra*; *Maher Terminals*, 33 S.R.R. at 832-34, 842 [R. Add.-197-99, 207]; M. App.

21

1A-307-371 (JA-__-__); M. App. 2B-442 (JA-__); P. App. II-244 (JA-__); P. App. II-91 (JA-__); P. App. I-1043-46 (JA-__-__).

The evidence also showed that the Port Authority and Maher believed that if Sea-Land and Maersk left for a competing port, it would have a severe and negative effect on transportation. The Port Authority risked losing not only Sea-Land and Maersk's substantial volume but that of other carriers as well, an estimated loss of up to fifty-five percent of the port's containerized cargo base. P. App. I-374, 393 (JA-__, __); P. App. I-1045 (JA-__). The Port Authority was also in danger of losing the private investment it needed to upgrade the infrastructure at its terminals. P. App. I-374, 388 (JA-__, __); P. App. I-1045 (JA-__); P. App. I-1157 (JA-__). The evidence further showed that retaining Sea-Land and Maersk would confer benefits on the port and its tenants, especially if the port became a hub. P. App. I-1045-46 (JA-__-__); P. App. I-374 (JA-__).

Conversely, there was no evidence that Maher presented a comparable risk to leave the port or offered carrier hub potential. *Maher Terminals*, 33 S.R.R. at 842 [R. Add.-207]. In particular, there was no evidence that Maher could have kept Sea-Land and Maersk from leaving in exchange for APM-Maersk's preferential rent, nor was there evidence that Maher could guarantee the Port Authority Sea-Land or Maersk containers. *Id.* at 846 [R. Add.-211]. Maher did not believe that it

22

could commit its own customers. *Id.* at 835, 846 [R. Add.-200, 211]; P. App. II-140 (JA-__); P. App. II-288, 296 (JA-__, __).

  B.  The Commission Correctly Held that Maher Did Not Prove that the Difference in Base Rent was Unjustified in Light of the Evidence

Given this evidence, Maher bore the burden of showing that the Port Authority's treatment of Maher and APM-Maersk with respect to base rent was nonetheless unjustified. *Petchem*, 853 F.2d at 963; *Maher Terminals*, 33 S.R.R. at 840-41 [R. Add.-205-06]; *Ceres I,* 27 S.R.R. at 1270 [R. Add.-167]. Maher did not and does not attempt to rebut this evidence or assert that it is not substantial. Rather, it argues that Sea-Land and Maersk's credible threat to leave the port is not a valid transportation factor as a matter of law under the Shipping Act. The Commission rejected this argument, and its reasoning is neither arbitrary and capricious nor contrary to law. *Maher Terminals*, 33 S.R.R. at 843-46 [R. Add.-208-10].

The plain language of the Shipping Act only forbids "'*undue* or *unreasonable* preference' and '*undue* or *unreasonable* prejudice.'" *Petchem*, 853 F.2d at 963; 46 U.S.C. § 41106(2). The Act does not define these terms, which are "broad and may plausibly admit consideration of a number of competing policies." *N.Y. Shipping Ass'n v. Fed. Mar. Comm'n*, 854 F.2d 1338, 1374 (D.C. Cir. 1988); *see also Petchem*, 853 F.2d at 964. The Commission is the expert agency that applies the Shipping Act and is responsible for determining what constitutes an

23

unreasonable preference (and thus a valid transportation factor) given the purposes of the Shipping Act. *See N.Y. Shipping Ass'n*, 854 F.2d at 1364; *cf. New York v. United States*, 331 U.S. 284, 347 (1947) ("Whether a discrimination in rates or services of a carrier is undue or unreasonable has always been regarded as peculiarly a question committed to the judgment of the administrative body, based upon an appreciation of all the facts and circumstances affecting the traffic."). When interpreting phrases such as "undue or unreasonable preference," the Commission is entitled to full *Chevron* deference, and Maher does not contend otherwise.

The Commission may consider factors such as the "transportation characteristics of a particular commodity," *Credit Practices of Sea-Land Serv. Inc.*, 25 S.R.R. 1308, 1315 (FMC 1990) [R. Add.-182], but its analysis is not limited to such characteristics, *N. Atl. Mediterranean Freight Conference – Rates of Household Goods*, 9 S.R.R. 775, 784 (FMC 1967) [R. Add.-333]. Rather, "recognized transportation considerations" include competition from other carriers or ports, the "fair interest" of a carrier or port, "the situation and circumstances of the respective customers, as competitive or otherwise," and the convenience of the public. *"50 Mile Container Rules" Implementation by Ocean Common Carriers Serving U.S. Atl. & Gulf Coast Ports*, 24 S.R.R. 411, 455 (FMC 1987) [R. Add.-

52]; *N. Atl. Mediterranean*, 9 S.R.R. at 784 [R. Add.-333].[8] With respect to ports

in particular, the Shipping Act leaves them "a vast amount of discretion to

structure deals," and "indeed encourages parties to enter into agreements tailored

to their individual needs." *Ceres Marine Terminals, Inc. v. Md. Port Admin.* (*Ceres*

*II*), 29 S.R.R. 356, 369 (FMC 2001) [R. Add.-142]. In so doing, a port may

consider the many factors relevant to negotiating a lease, which include market

conditions, available locations and facilities, and the nature and character of

potential lessees. *Ceres I*, 27 S.R.R. at 1274 [R. Add.-171]).

Courts have similarly interpreted section 3 of the Interstate Commerce Act

("ICA"), 24 Stat. 379 (1887) – upon which § 41106(2) is based – to permit

consideration of factors such as volume, market conditions, and competitive forces

or conditions in the unreasonable preference analysis.[9] *Harborlite Corp. v.*

*Interstate Commerce Comm'n*, 613 F.2d 1088, 1095 (D.C. Cir. 1979); *see also L.T.*

*Barringer & Co. v. United States*, 319 U.S. 1, 13 (1943); *Texas & Pac. Ry. Co. v.*

*Interstate Commerce Comm'n*, 162 U.S. 197 (1896); *Dresser Indus., Inc. v.*

---

[8] Although most of the unreasonable preference caselaw involves carriers, the Commission has applied the principles therein to marine terminal operators. *See*, *e.g.*, *Ceres I*, 27 S.R.R. at 1270-74 [R. Add.-167-71].

[9] The predecessor of § 41106(2) – section 16 First of the Shipping Act of 1916 – "is substantially identical with section 3(1) of the Interstate Commerce Act," ch. 104, § 3, 24 Stat. 379, 380 (1887). *N. Atl. Mediterranean*, 9 S.R.R. at 783 [R. Add.-332].

*Interstate Commerce Comm'n*, 714 F.2d 588, 598-99 (5th Cir. 1983); *cf. Wheeler*

*v. Pilgrim's Pride Corp.*, 591 F.3d 355, 366-69 (5th Cir. 2009) (en banc) (Jones,

C.J., concurring) (discussing meaning of "undue or unreasonable preference"

under § 3 of the ICA).[10] Early in its history, the Supreme Court in fact found that

the Interstate Commerce Commission ("ICC") erred by *not* considering as a valid

factor that a carrier charged preferential rates to prevent the loss of business to

competitors. *Tex & Pac. Ry. Co.*, 162 U.S. at 217; *see also id.* (holding that ICC

must "consider also the desire and advantage of the carriers in securing special

forms of traffic, and the interest of the public that the carriers should secure that

traffic, rather than abandon it, or not attempt to secure it").

---

[10] Maher cites two cases involving section 2 of the ICA – *Interstate Commerce Comm'n v. Delaware, Lackawanna & W. R.R. Co.*, 220 U.S. 235 (1911), and *L.T. Barringer & Co. v. United States*, 319 U.S. 1 (1943) -- which prohibits "unjust discrimination" and "has been thought to prohibit any differentiation between shippers on the basis of their identity, . . .or on the basis of competitive conditions which may induce a carrier to offer a reduction in rate to one shipper while denying it to another similarly situated." *L.T. Barringer*, 319 U.S. at 6. Although the Commission and courts have referred to "unreasonable preference" in terms of "discrimination," as noted above, unreasonable preference under § 41106(2) is based on section 3 of the ICA, not section 2. And the Supreme Court has "frequently sustained the [Interstate Commerce] Commission's determination, in cases arising under § 3, that differences in competitive conditions justify lower through rates over one route than over another." *Id.* at 13. Section 2 of the ICA's counterpart is the first paragraph of Section 17 of the Shipping Act of 1916. *N. Atl. Mediterranean*, 9 S.R.R. at 785 [R. Add.-334]. This paragraph and section 10(b)(10) of the Shipping Act of 1984 only apply to carriers, not marine terminal operators.

The Commission thus considered relevant transportation factors when it took into account Sea-Land and Maersk's threat to take their cargo to a competing port and the potential consequences of such a move. Maher's attempt to constrain the Commission's analysis to "the costs or nature of the transportation service being provided" ignores decades of Commission and court precedent, and its argument that a party's identity or commercial status is not a legitimate transportation factor ignores the Commission's actual findings. The Commission did not find that the Port Authority treated Maher and APM-Maersk differently due to their carrier-affiliated status. *Maher Terminals*, 33 S.R.R. at 843-44 [R. Add.-208-09]. Rather, the Commission found that the Port Authority gave APM-Maersk preferential base rent because its carrier affiliate made a credible threat to leave the Port for Baltimore if its demands were not met, the threat posed a significant risk to overall transportation at the port, and retaining Sea-Land and Maersk offered substantial benefits to everyone at the port, including Maher. *Id.* There was no evidence that Maher was in a position to avert those risks or provide those benefits.

This particular threat distinguishes the present case from *Ballmill Lumber & Sales Corp. v. Port of New York Authority*, 10 S.R.R. 131 (FMC 1968) [R. Add.-99], and *Ceres I. Maher Terminals*, 33 S.R.R. at 843-44 [R. Add.-208-09], cases that Maher insists cabin what the Commission may consider. In both cases, the respondents argued, among other things, that a preference was justified because

27

otherwise a tenant or carrier might leave the port at issue. *Ballmill,* 10 S.R.R. at 137-38 [R. Add.-105-06]; *Ceres I*, 27 S.R.R. at 1260-61 [R. Add.-157-58]. And in both cases, the Commission rejected these arguments without specifically addressing them. *Ballmill*, 10 S.R.R. at 138, 139 [R. Add.-106, 107]; *Ceres I*, 27 S.R.R. at 1272-74 [R. Add.-169-71] (noting that it was aware of increased competition among ports and rejecting respondent's argument that the Commission owes ports deference). In neither case, however, did the Commission address the credibility of the threat to leave, and its likely effect on transportation. Here, the Commission examined these factors as it was obligated to do under longstanding precedent.

Maher would read the Commission's lack of lengthy analysis in *Ballmill* and *Ceres I* as proof that the Commission may never consider a port's need to react to competitive conditions as part of the unreasonable preference analysis, no matter the potential consequences. The Commission addressed these cases and reasonably declined to give its prior silence such weight. *Maher Terminals*, 33 S.R.R. at 844; *see also Vernal Enters. v. Fed. Commc'ns Comm'n*, 355 F.3d 650, 658 (D.C. Cir. 2004) ("Moreover, we must defer to an agency's reasonable application of its own precedents."). To read *Ceres I* as foreclosing the Commission's reasoning here is particularly misguided. In *Ceres I*, the Commission found that it was irrational for the respondent to distinguish between tenants based on status alone when Ceres

28

was willing and able to provide the vessel calls the respondent wanted. *Ceres I*, 27 S.R.R. 1272-73 [R. Add.-169-70]. As the Commission pointed out, however, this case does not involve a generic status-based distinction or a commitment that Maher could or was willing to make. *Maher Terminals*, 33 S.R.R. at 843, 846 [R. Add.-208, 211]; *see* Argument Part II.C, *infra*. And the Commission expressly emphasized in *Ceres I* and in a later order that its decision was not intended to constrain ports from negotiating leases on a case-by-case basis and considering many relevant factors. *Ceres I*, 27 S.R.R. at 1273-74 [R. Add.-170-71]; *Ceres II*, 29 S.R.R. at 370 [R. Add.-143].[11]

Maher's attempts to manufacture reversible error are unavailing. Maher argues that the Commission failed to explain "how Maersk's threat to leave the Port qualified as a 'transportation factor.'" Pet. Br. at 32. The Commission, however, examined the evidence, addressed Maher's arguments, and articulated why it found them unpersuasive. *Maher Terminals*, 33 S.R.R. at 843-45 [R. Add.-

---

[11] On appeal from *Ceres I*, the Fourth Circuit remanded the case to the Commission to consider the respondent's estoppel argument. *Md. Port Admin. v. Fed. Mar. Comm'n*, Case No. 97-2418, 1998 U.S. App. LEXIS 25733, at *16 (4th Cir. Oct. 13, 1998). The Commission rejected this argument in *Ceres II*, 29 S.R.R. at 372 [R. Add.-145]. The Commission subsequently dismissed Ceres' complaint entirely because the respondent was entitled to sovereign immunity in light of the Supreme Court's decision in *Fed. Mar. Comm'n v. S. Car. State Ports Auth.*, 535 U.S. 743 (2002). *Ceres Marine Terminals, Inc. v. Md. Port Admin.* ("*Ceres III*"), 30 S.R.R. 358, 370 (FMC 2004) [R. Add.-128].

208-10]. And although "magic words" are not necessary,[12] the Commission

determined that the Port Authority's reasons were "transportation justifications."

*Maher Terminals*, 33 S.R.R. at 847 [R. Add.-212].

Nor did the Commission misapply the burdens of persuasion or production.

After Maher met its initial burden, and after the Port Authority in turn produced

evidence justifying its conduct, Maher bore the burden of showing that the

justification was invalid under the Shipping Act. *Id.* at 840-41 [R. Add.-205-06];

*Petchem*, 853 F.2d at 963 (noting that "the challenging party has, in the

Commission's words, the 'ultimate burden' of establishing that the justifications

fall short of what the law requires"); Maher Exc. to 5/16/2011 Initial Decision at

33-35 (JA-__-__).[13]

As for Maher's magnitude argument, Pet. Br. at 49-52, Maher did not argue

in its exceptions that the Port Authority discounted APM-Maersk's rent more than

necessary to keep Sea-Land and Maersk from leaving. Thus any such argument is

forfeited on appeal. *Malladi Drugs & Pharms., Ltd. v. Tandy*, 552 F.3d 885, 891

---

[12] *R.I. Consumers' Council & Division of Public Utilities & Carriers of the State of R.I. v. Fed. Power Comm'n*, 504 F.2d 203, 213 n.19 (D.C. Cir. 1974); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Chiquita Brands Int'l Inc. v. SEC* , Case No. 14-5030, 2015 U.S. App. LEXIS 12348, at *25 (D.C. Cir. July 17, 2015).
[13] *Harborlite Corp. v. Interstate Commerce Comm'n*, 613 F.2d 1088 (D.C. Cir. 1979) is inapposite. Pet. Br. at 33. There, the court found that the ICC applied the wrong burden at the disparity stage of the ICA analysis, which is equivalent to the second element of an unreasonable preference claim, an element not in dispute here. *Id.* at 1096.

(D.C. Cir. 2009). At most, it cited unreasonable practice cases for the general proposition that a discriminatory practice is unreasonable if it goes beyond what is necessary to achieve its purpose and focused on the port guarantee. Maher Exc. at 12, 15, 57-58 [JA-__, __, __-___). The Commission addressed this vague suggestion in any event, finding that Maersk and Sea-Land threatened to leave for Baltimore if they did not receive $120 million in concessions, "APM-Maersk's rent was part of these concessions, which were necessary to match the offer from Baltimore," and there was "no evidence that these concessions went beyond what was necessary to keep Maersk and Sea-Land in the Port, as Maher suggests." *Maher Terminals*, 33 S.R.R. at 842, 842 n. 11 [R. Add.-207]; P. App. I-2679 (JA-__). The Port Authority's need to retain Sea-Land and Maersk at the port thus accounted for the magnitude of the base rent difference. *Cf. Dresser Indus.*, 714 F.2d at 599-600 ("Here, the disparity is no more than is required for BN to meet CNW's competitive Casper rate, and is both fully explained and adequately justified by that rate.").

Maher's concern that "treating the threat of losing carrier business from a[] [marine terminal operator's] affiliate as a valid transportation factor" would give port authorities free reign to grant preferences based on status is unfounded. Pet. Br. at 23. The Commission's decision does not give port authorities license to prefer certain terminal operators over others due to carrier affiliation alone. This

31

case involved a specific threat, by two specific carriers, whose container volume

loss all parties agreed would cause severe, specific, and quantifiable harm, and

whose retention was projected to generate benefits to the entire port. The Shipping

Act "encourages parties to enter into agreements tailored to their individual needs,"

*Ceres II*, 29 S.R.R. at 369 [R. Add.-142], and provides that the Commission's

nondiscriminatory regulatory process be achieved with a "minimum of government

intervention and regulatory costs." 46 U.S.C. § 40101(1). The Commission's

decision here is consistent with both policies.

C.    The Commission's Findings Regarding the Port Guarantee and
      Terminal Characteristics Are Supported by Substantial Evidence

    In addition to finding that the Port Authority gave APM-Maersk preferential

base rent because of the threat to leave and potential consequences thereof, the

Commission found that: (a) "Maher has not established that the ALJ erred in

concluding that APM-Maersk's port guarantee was one factor justifying the lease

differences;" and (b) "Maher has not met its burden of showing that the differences

between the terminals are illegitimate reasons for the difference in rent paid by

Maher and APM-Maersk." *Maher Terminals*, 33 S.R.R. at 846 [R. Add.-211]. The

Commission did not purport to find that the port guarantee or the terminals'

characteristics were alternative justifications for the difference in base rent. And it

did not suggest that these were additional reasons that, when combined with the

threat to leave the port, justified the magnitude of the rent difference. Rather, the

32

Commission found that the Port Authority presented evidence that these considerations affected the base rent difference at least in part, *id.* at 842-43 [R. Add.-207-08], and concluded that Maher's arguments for discounting this evidence were unpersuasive, *id.*846 [R. Add.-211]. The evidence supports these narrow findings.

As for the port guarantee, the Commission recognized that the Port Authority insisted on a port guarantee for two purposes. *Maher Terminals*, 33 S.R.R. at 833 [R. Add.-198]. First, the port guarantee, along with a throughput guarantee and investment requirement, was designed to prevent intraport cargo shifts – that is, to prevent Maersk from obtaining favorable rent, using its terminal (APM-Maersk) to serve third-party carriers, and then effectively leaving the port by sending its own cargo elsewhere. *Id.* at 833, 846 [R. Add.-198, 211]; M. App. 1B-731 (JA-__). In that sense the port guarantee was, as Maher notes, Pet. Br. at 39, an enforcement mechanism to keep Maersk from abandoning the port, which was in this case a valid transportation purpose. By serving this function, the port guarantee was therefore a factor that justified the lease differences.

The Port Authority also designed the port guarantee to obtain Maersk's discretionary cargo because it wanted its port to be a hub. *Maher Terminals*, 33 S.R.R. at 833-34, 846 [R. Add.-198-99, 211]. Maher points out on appeal that the port guarantee did not guarantee as much cargo as the Port Authority initially

33

demanded and that Maersk abandoned the hub port concept during negotiations. Pet. Br. at 38. But, as Maher acknowledges, it is unclear whether the Port Authority knew of Maersk's plans. *Id.* at 13. Further, that Maersk was able to bargain the port guarantee down does not make the Commission's finding that the port guarantee played a role in base rent erroneous.

Moreover, the Commission reasoned that the port guarantee was not analogous to the vessel call commitment in *Ceres I. Maher Terminals*, 33 S.R.R. at 846 [R. Add.-211]. There the Commission found that Ceres was entitled to the preferential rates because it was willing and able to satisfy the substance of the vessel call commitment, a commitment the Commission found was illusory in any event. *Ceres I*, 27 S.R.R. at 1272, 1273 [R. Add.-169, 170]. Here, not only was Maher incapable of averting Sea-Land and Maersk's threat, it could not guarantee Maersk's loaded containers, which the Port Authority wanted to retain the carrier in the port and establish itself as a hub. *Maher Terminals*, 33 S.R.R. at 846 [R. Add.-211]. Maher's throughput commitments, no matter how high, could not serve these purposes, i.e., it could not satisfy the substance of the port guarantee. *Id.* Further, the port guarantee contained a shortfall penalty, and Maher did not believe it was in a position to commit its customers and make a similar guarantee. *Id.*; P. App. II-140-41 (JA-__-__); P. App. II-288, 296 (JA-__, __).

34

As for the terminals' characteristics, the Commission addressed the pretext argument that Maher actually raised before it, not the one it now presents. *Id.* at 845, 846 [R. Add.-210, 211]. Maher argued repeatedly to the Commission that the Port Authority could not rely on the differences in terminal characteristics because the Port Authority did not *express* its reasoning. *Id.* at 845 [R. Add.-210]; *e.g.*, Maher Exc. at 39 (JA-___). The Commission declined to find that the Port Authority was required to express its reasoning to Maher or create contemporaneous analyses, *Maher Terminals*, 33 S.R.R. at 845, 846 [R. Add.-210, 211], and Maher does not challenge this reasoning on appeal. The Commission did not knock down a straw man but rather addressed the arguments Maher raised before it.

Second, the Commission's finding that the evidence "shows that Maher's higher rent was based in part on the characteristics of the terminal" is supported by the record. *Id.* at 842-43, 846 [R. Add.-207-08, 211]; P. App. VII-13-18 (JA-___-___). According to the Port Authority's lead negotiator, "[t]hose rate differences that resulted in those terminal agreements were based on many factors," including "different arrangements for different terminals." P. App. VII-14-15 (JA-___-___). As noted above, Maher challenged this notion because it believed that the justification was not expressed at the time and that no contemporaneous particularized analysis of land characteristics was conducted. Maher Exc. at 39-40 (JA-___-___). It also argued that the contemporaneous evidence established that APM-Maersk received

35

the more desirable land, an argument that the Commission rightly dismissed as unsupported. *See* Argument Part III.B, *infra* (addressing Maher's evidentiary arguments about the terminals' relative values). And although the Commission did not address Maher's magnitude argument in the context of terminal characteristics (because Maher did not raise it in its exceptions), the Commission nonetheless noted that the Empire Report indicated that Maher *itself* attributed the base rent difference to its terminal's favorable infrastructure attributes. *Maher Terminals*, 33 S.R.R. at 846 [R. Add.-211]; P. App. I-2149-50 (JA-__-__). This evidence sufficiently supports the scope of the Commission's finding.

Additionally, if the Court concludes that the Commission erred in concluding that the port guarantee offered any value beyond helping to retain Maersk in the port, or erred in crediting the evidence that terminal characteristics played a role in the base rent difference, the Court should still deny Maher's petition. This court has "consistently held that when an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717-18 (D.C. Cir. 2006) (internal quotation marks omitted); *Syracuse Peace Council v. Fed. Communications Comm'n*, 867 F.2d 654, 657 (D.C. Cir. 1988). As described above, the Port Authority's conduct was fully

36

justified by its need to retain Sea-Land and Maersk and to avoid the consequences of their loss.[14]

## III.   THE COMMISSION CORRECTLY CONCLUDED THAT MAHER FAILED TO PROVE ITS UNREASONABLE PRACTICE CLAIM

The Commission's conclusion that Maher failed to prove its unreasonable practice claim under 46 U.S.C. § 41102(c) is not arbitrary and capricious or contrary to law and is supported by substantial evidence. The Commission applied the standard set forth in *Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261, 282 (1968) and considered whether Maher's rent was commensurate with the benefits it achieved under its lease in light of the rent and leases of other port tenants. In so doing, the Commissioned relied on a significant amount of relevant evidence. Maher's attempt to undermine this evidence is not supported by the record.

---

[14] Although the court need not reach the issue because the Commission's decision should be upheld and the petition should be denied, the Commission agrees with Maher that the extent to which the statute of limitations (and the Commission's summary judgment order) affects Maher's entitlement to reparations should be decided, if at all, by the Commission in the first instance. Although the parties submitted briefs regarding the scope of the Commission's order, Order Scheduling 2d Supp. Briefs at 1 (Feb. 1, 2013) (JA-__); Maher 2d Supp. Br. at 10 (Feb. 22, 2013) (JA-__); Port Resp. to Maher 2d Supp. Br. at 1 (Mar. 15, 2013) (JA-__), neither the ALJ nor the Commission addressed it because both denied Maher's unreasonable preference claims on the merits. The Commission should be permitted to interpret its prior order, if necessary, on remand.

A.    <u>The Commission Applied the Appropriate Standard</u>

Section 41102(c) provides that a marine terminal operator "may not fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property."[15] As the Commission recognized, the "proper inquiry" for purposes of an unreasonable practice claim is "in a word, whether the charge levied is reasonably related to the service rendered." *Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261, 282 (1968); *Plaquemines*, 838 F.2d at 547 ("Application of the *Volkswagenwerk* standard requires matching costs assessed to the benefits received."). Determining whether there is a reasonable relationship between a charge and a benefit often involves comparing a complainant's situation with that of others. *See*, *e.g.*, *Volkswagenwerk*, 390 U.S. at 281; *Ceres I*, 27 S.R.R. at 1275 [R. Add.-172]; *NPR, Inc. v. Bd. of Comm'rs of the Port of New Orleans*, 28 S.R.R. 1512, 1533 (ALJ 2000) [R. Add.-365].

Consistent with this precedent, the Commission analyzed whether Maher's rent was reasonably related to the benefits associated with its lease (i.e., the attributes of its terminal and its ability to make money from the terminal) and compared these costs and benefits with those of other port tenants. *Maher*

---

[15] Section 41102(c) codifies section 10(d)(1) of the Shipping Act of 1984, Pub. L. No. 98-237, § 10, 98 Stat. 67, 78, 80. Section 10(d)(1) in turn derives from the second paragraph of section 17 of the Shipping Act of 1916. *Ceres I*, 27 S.R.R. at 1274 [R. Add.-171]; *Plaquemines,* 838 F.2d at 546.

*Terminals*, 33 S.R.R. at 852-53 [R. Add.-217-18]. As discussed below, the

Commission relied on evidence that compared the relative rents and benefits of the

various terminals.[16] The Commission did not focus on Maher's rent and terminal

value "in the abstract" as Maher claims. Pet. Br. 26, 57. Rather, it concluded that

the evidence comparing Maher's rent and terminal with those of other Port

Authority tenants – including APM-Maersk – did not show that Maher's rent was

disproportionate or excessive. Although it was appropriate to focus solely on

Maher and APM-Maersk in the unreasonable preference context, an unreasonable

practice claim asks a different question. APM-Maersk's lower rate was of limited

relevance to the unreasonable practice inquiry because it did not indicate that

Maher's rent was disproportionate; rather it indicated that APM-Maersk received

concessions to disarm Sea-Land and Maersk's threat to leave. The Commission

addressed the APM-Maersk difference in its unreasonable preference analysis and

reasonably declined to repeat its reasoning when addressing Maher's unreasonable

practice claim. By considering all the relevant terminals, the Commission followed

the guidance of *Volkswagenwerk* and its progeny.

---

[16] The Commission's opinion incorrectly cites the Empire Report in the
unreasonable practice section, *Maher Terminals*, 33 S.R.R. at 853 [R. Add.-218],
but it accurately cites the Empire Report in the background section, *id.* at 836 [R.
Add.-201].

B.     The Commission's Conclusion that Maher Had Not Established an Unreasonable Practice Claim Is Supported by Substantial Evidence

The Commission's conclusion that Maher had not proved an unreasonable practice violation is also supported by substantial evidence, and the Court should decline Maher's invitation to re-weigh the evidence. *United Steel Workers v. Pension Benefit Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013). The Commission relied on the Empire Report, which not only indicated that Maher's lease terms were in line with market lease arrangements but also stated that "[m]anagement believed that the terms of the U.S. Lease Agreement were on comparable terms to other terminal operators within Port Elizabeth, with one exception (due to negotiating power and timing)." P. App. I-2148-50 (JA-__-__); *Maher Terminals*, 33 S.R.R. at 836, 852-53 [R. Add.-201, 217-18]. The report also stated that differences in base rent were due to Maher's favorable terminal characteristics. P. App. I-2149-50 (JA-__). In addition, the Greenhill Memorandum, which Maher used to solicit potential investors, and the expert report of the Port Authority's expert, John Vickerman weigh against Maher's arguments that its rent was disproportionate with what it received. *Maher Terminals*, 33 S.R.R. at 852-53 [R. Add.-217-18]; P. App. IV-317-19 (JA-__-__); P. App. I-1577, 1614-15 (JA-__, __-__).

Maher's criticisms of this evidence fail to withstand scrutiny. Pet. Br. at 45-46, 48-49, 58. That the Greenhill Memorandum, Empire Report, and Vickerman

40

report were created and prepared in 2005, 2008, and 2011, has little effect on their relevance. These sources cited the size of Maher's terminal, its configuration or geometry, and flexibility of yard usage as key attributes as compared to other terminals. P. App. I-2149-50 (JA-__-__) (Empire Report); P. App. I-1577, 1614-15 (JA-__, __-__) (Greenhill Memorandum); P. App. IV-317-19 (Vickerman Report). The size and shape of Maher's terminal, however, were accounted for in Maher's 2000 lease. M. App. 5A-5-6 (JA-__-__) (Lease No. EP-249); P. App. IV-318, 328 (JA-__, __). Although Maher invested an additional $215 million in its terminal in addition to the financing the Port Authority provided, this investment did not change the size or shape of Maher's terminal. M. App. 1C-1445 (noting that Maher invested $215 million in "cranes, straddle carriers, reach stackers and other various types of equipment.").

Maher's argument that the "Empire Report did not even compare Maher's terminal to APM-Maersk's terminal" focuses on the wrong page of the report. Pet. Br. at 49. Maher accurately points out that APM-Maersk was not listed in the "Competition & Publicly Traded Comparable Companies" section of the Empire Report, pages 9-12. P. App. I-2144-47 (JA-__-__). It was not included in the competition section because Empire was focusing on container terminal operators "who could compete because they're multi-user terminal operators" whereas APM-Maersk was "really a single provider" and was "not considered by Greenhill or by,

41

at the time, the management or RREEF as a competitor." M. App. 2A-129-30 (JA-__-__). The Commission, however, cited pages 13-15 of the Empire Report, which are in a different section. P. App. I-2148-2149. According to the testimony of an Empire representative, APM-Maersk's lease was included in Empire's page 13 analysis, and there is no indication that it was not part of the analysis on pages 14 and 15 as well. P. Supp. App. II-208, 210-11, 222 (JA-__, __-__, __).

Further, the Commission appropriately found that the 1997 HDR Report on which Maher relies does not indicate the relative value of Maher or APM-Maersk's terminals as consolidated and reconfigured according to the leases. *Maher Terminals*, 33 S.R.R. at 846, 853 [R. Add.-211, 218]. The report ranked the terminals based on a survey of fourteen port professionals. M. App. 1A-75 (JA-__). These individuals rated generic, unidentifiable versions of the separate terminals as they existed in 1997. M. App. 1A-72, 76 (JA-__, __) (ranking Maher Tripoli and Maher Fleet terminals separately as Terminal B and Terminal C, respectively). The report says nothing about how the terminals would have been ranked after consolidation and reconfiguration. P. App. VII-49-50 (JA-__-__).

Moreover, that the Port Authority offered APM-Maersk and Maher similar base rent in negotiations in 1998 and 1999 is hardly conclusive evidence that the Port Authority believed that the terminals were of equal value. Base rent was only part of the equation. The Port Authority's various proposals also included

42

throughput rent, M. App. 1B-537 (JA-___); M. App. 1B-911 (JA-___), which would capture key terminal characteristics such as size and configuration, i.e., terminals that were larger and more favorably configured would have higher container throughput and thus pay higher rent. The Port Authority's modernization plan called for a "level playing field" in terms of on-terminal infrastructure; it did not assume that the terminals were equally valuable. M. App. 1A-114 (JA-___). In sum, the evidence regarding base rent proposals does nothing to undercut evidence on which the Commission relied, which was more than adequate under the "substantial evidence" standard.

## CONCLUSION

For the reasons set forth above, Maher's petition for review should be denied.

Respectfully Submitted,

August 21, 2015

WILLIAM J. BAER
*Assistant Attorney General*

TYLER J. WOOD
*General Counsel*

43

/s/ Robert J. Wiggers                          /s/ Joel F. Graham

ROBERT J. WIGGERS                              JOEL F. GRAHAM
ROBERT B. NICHOLSON                            *Attorney-Advisor*
*Attorneys*                                    FEDERAL MARITIME COMMISSION
DEPARTMENT OF JUSTICE                          Office of General Counsel
Antitrust Division                             800 N. Capitol Street, N.W.
950 Pennsylvania Avenue, N.W.                  Washington, D.C. 20573
Washington, D.C. 20530                         Phone: (202) 523-5740
Phone: (202) 514-2460                          jgraham@fmc.gov
Robert.Wiggers@usdoj.gov

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

I certify that the foregoing brief complies with the type-volume limitation and typeface and type-style requirements of Fed. R. App. P. 32 and D.C. Circuit Rule 32(e) and contains 10,363 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), and was prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

August 21, 2015                  /s/ Joel F. Graham

                                 Joel F. Graham
                                 *Attorney-Advisor*
                                 FEDERAL MARITIME COMMISSION
                                 Office of General Counsel
                                 800 N. Capitol Street, N.W.
                                 Washington, D.C. 20573
                                 Phone: (202) 523-5740
                                 jgraham@fmc.gov

45

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Respondents' Brief was electronically

filed with the Clerk of the Court on this 21st day of August, 2015, using the

CM/ECF system, which will send notification of such filing to those listed below.

Richard P. Bress
Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Email: richard.bress@lw.com
melissa.sherry@lw.com
*Counsel for Petitioner Maher Terminals, LLC*

Peter D. Isakoff
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, N.W.
Suite 900
Washington, D.C. 20005
Email: peter.isakoff@weil.com

Richard A. Rothman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
Suite 3323
New York, NY 10153
Email: richard.rothman@weil.com
*Counsel for Intervenor The Port Authority of New York and New Jersey*

/s/ Joel F. Graham
Joel F. Graham
Attorney-Advisor
Federal Maritime Commission
Office of General Counsel
800 N. Capitol Street, N.W.

46

Washington, D.C. 20573
Phone: (202) 523-5740
jgraham@fmc.gov